**E-FILED**
Friday, 23 January, 2009  08:59:27 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| ANN M. SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 07-cv-1344 |
| | ) | |
| MICHAEL ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N  &  O R D E R

Before the Court are Plaintiff's Motion for Summary Judgment, filed on June 10, 2008 (Doc. 15) and Defendant's Motion for Summary Affirmance, filed on July 28, 2008 (Doc. 17).  For the reasons stated below, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Affirmance is GRANTED.

## BACKGROUND

### Procedural History

On February 9, 2004, Plaintiff Ann Sanders applied for disability insurance benefits and supplemental security income, claiming that she had been disabled and unable to work since August 20, 2003 due to injuries resulting from a car accident.  (R. 83-85, 302-04).  The agency denied her application initially and also upon reconsideration in early 2004.  (R. 26-29, 295-301).  Plaintiff subsequently requested a hearing and appeared with her attorney to testify before an

Administrative Law Judge (ALJ) on January 18, 2007 in Peru, Illinois.  (R. 338-73).

Edward Pagella, a vocational expert, also testified at the hearing.

On January 25, 2007, the ALJ denied Plaintiff's claim.  (R. 18-25).  Plaintiff

then filed a request for review of the ALJ's decision with the Appeals Council.  (R.

306-09).  On October 19, 2007, the Appeals Council denied Plaintiff's request for

review, which made the ALJ's decision the final decision of the Commissioner.  See

20 C.F.R. §§ 404.981, 416.1481.  It is undisputed that Plaintiff has exhausted her

administrative remedies and that her case is ripe for review by this Court.  (Def.'s

Br. at p. 1).

**Medical History**

Plaintiff sustained injuries as the result of a car accident that occurred on

August 20, 2003.  On that date, following the accident, Plaintiff was taken to Perry

Memorial Hospital in Princeton, Illinois, where she was diagnosed with a fractured

right ankle (medial malleolus fracture) as well as multiple abrasions and

contusions.  (R. 226, 231, 235).  Medical records reflect that Plaintiff also

complained of pain in the area of her right hip and left elbow when she arrived at

the hospital.  (R. 230-31).

The next day, August 21, 2003, Dr. Sekhar Sompalli, an orthopedic surgeon,

operated on Plaintiff's right ankle.  He performed an open reduction and internal

fixation procedure in which two screws were used to repair the ankle fracture.  (R.

226).  Additionally, an x-ray of Plaintiff's cervical spine, taken on the same date,

revealed early degenerative disc disease at C5/6 and mild upper thoracic

levoscoliosis, but no acute traumatic abnormality.  (R. 238-40).

In December 2003, Plaintiff was still experiencing discomfort in her right ankle.  A December 2003 x-ray and a January 2004 CT scan revealed a non-union in Plaintiff's right medial malleolus, indicating that her right ankle fracture had not completely healed after the August 21, 2003 surgery.  (R. 173-74, 196).  On January 22, 2004, Dr. Sompalli performed surgery to remove the fixation hardware from Plaintiff's right ankle and to graft a bone from Plaintiff's tibia to repair the ankle.  (R. 196-97).  Intra-operative views taken on the same date revealed overall anatomic alignment and were deemed to be satisfactory.  (R. 201).

On March 5, 2004, Plaintiff had a follow-up examination with Dr. Sompalli regarding her January 22, 2004 bone graft.  After examining Plaintiff, Dr. Sompalli stated that Plaintiff could start bearing weight on the ankle, as tolerated, while wearing a boot cast.  (R. 168).  Dr. Sompalli also recommended that Plaintiff use a bone stimulator to help speed up the healing of the ankle fracture.  (R. 168).  An April 30, 2004 x-ray revealed that the ankle fracture had healed.  (R. 165).  A May 28, 2004 x-ray also revealed that the facture had healed nicely, but in a report authored on that day, Dr. Sompalli noted that Plaintiff was still experiencing pain in the ankle.  (R. 164).  After a July 19, 2004 follow-up appointment, Dr. Sompalli's records indicate that Plaintiff's ankle pain had receded and that was she was "weightbearing as tolerated."  (R. 163).  The doctor also indicated in his July 19, 2004 notes that Plaintiff complained of back pain and that he would recommend her to a spine surgeon.

On August 13, 2004, an x-ray of Plaintiff's spine at Perry Memorial Hospital revealed the following observations: "a mild chronic compression deformity

3

involving the T9 vertebral body.  No acute compression fracture or significant subluxation is identified." (R. 180).  On September 17, 2004, Dr. Sompalli indicated on a form that Plaintiff was cleared to return to light work duties as of that date, specifically remarking "Desk duty only." (R. 242).

On October 5, 2004, Dr. Nirain A. D'Souza wrote to Dr. Sompalli, indicating that Plaintiff had come to see him regarding tenderness in her ankle.  Dr. D'Souza noted that x-rays revealed an "excellent union" in Plaintiff's medial malleolus (ankle), but he recommended an MRI to confirm this and to confirm the absence of "concurrent edema or inflammation of the associated flexor tendons." (R. 261).  A subsequent MRI of Plaintiff's ankle revealed a "small area of what appears to be an osteoochondral defect over the medial side of the tibial plafond" but no "inflammation or tenosynovitis of the associated flexor tendons on the medial sides of the ankle." (R. 263).  In notes taken around the time of the MRI, Dr. D'Souza observed that Plaintiff's ankle pain was such that she needed to use a cane periodically. (R. 263).

On October 18, 2004, Plaintiff visited with Dr. Robert Eilers, a physician who appears to be associated with the American Academy of Physical Medicine and Rehabilitation.  Based on the visit, Dr. Eilers noted that "[Plaintiff's] major problem at this time is that she cannot sit up for long periods of time before she starts having pain.  She needs to lay back." (R. 253).  Under a section of his report entitled "ACTIVITIES OF DAILY LIVING," Dr. Eilers noted that Plaintiff "has difficulty doing yard work, walking long distances, carrying and lifting overhead.

She can sit continuously, stand 15 minutes, and walk 13 minutes. She cannot lift more than 30 pounds." (R. 254).

Dr. Eilers noted, on October 18, 2004, that x-rays of Plaintiff's spine showed a thoracic compression fracture. He observed "significant myofascial trigger points over the cervical paraspinals, trapezius muscle, the rhomboids, as well as thoracic paraspinals and the lumbosacral paraspinals." (R. 255). Dr. Eilers also observed the following: Plaintiff's upper extremity range of motion, sensation, strength and reflexes were intact; her lower extremity range of motion, sensation, strength and reflexes were intact on the left; she was able to ambulate with a cane on her left side to shift weight off of her right side; and her right ankle was healed. The doctor stated in his notes that "[x]-rays show the thoracic compression fracture, which is old and essentially stable at this time . . . . It is a stable fracture. The patient is able to come sitting and standing effectively." (R. 255). Dr. Eilers also indicated that Plaintiff "has no neurogenic bowel or bladder or any other impairments." (R. 255).

In the same evaluation report, Dr. Eilers went on to opine that Plaintiff "is basically going to be disabled for competitive employment in light of her education and her background until she is able to weight bear more effectively, but I think she is going to continue to have weight limitations secondary to the ankle, as well as due to the neck and shoulder." (R. 256). He concluded that Plaintiff would benefit from aggressive rehabilitation services. (R. 255-56).

On January 12, 2005, Dr. Eilers performed a follow-up evaluation on Plaintiff. His report on this visit reflected Plaintiff's complaints of continued pain.

Dr. Eilers stated in the report that Plaintiff "has difficulty with prolonged sitting, standing, and walking, and at this point in time she is not really able to participate in competitive employment." (R. 257). The doctor advised Plaintiff to continue with a home exercise program but stated in his report that Plaintiff "has reached the maximal benefit from physical therapy and understands that she will have permanent limits." (R. 258).

Plaintiff met with Dr. Eilers again on or around July 28, 2005. Dr. Eilers' conclusions were the basically the same as his conclusions in January 2005. In the July report, Dr. Eilers stated that Plaintiff complains of chronic pain. He noted that "[t]he thoracic compression fracture is stable" and that "[Plaintiff] does have the back pain and myofascial pain secondary to the compression fracture and has the pain secondary to the right ankle fracture." (R. 259). He further stated, "My recommendation at this time is that she limits her mobility and remains in sedentary activity. She has applied for Social Security Disability, which I think is most appropriate, and unfortunately it is probably not going to be on a competitive employed basis. She completed high school but no further training." (R. 260). Dr. Eilers concluded that Plaintiff "will need to stay in light sedentary work parameters." (R. 260).

### Agency Evaluations

On March 23, 2004, Dr. F. Paul LaFata, a state agency physician, reviewed Plaintiff's medical records and performed a residual functional capacity assessment. In his report, Dr. LaFata concluded that Plaintiff was able to do the following: lift or carry up to 25 pounds frequently; lift or carry up to 50 pounds occasionally; sit (with

normal breaks) for a total of about 6 hours in an 8-hour workday; stand or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; and push or pull, as required, normally.  (R. 245-52).  Doctor LaFata concluded that Plaintiff did not have postural limitations, manipulative limitations, or environmental limitations.[1]  He concluded that Plaintiff was able, at the time of his evaluation, to start bearing weight on her right ankle, as tolerated, and that she would be able to return to medium work twelve months from her surgery in January 2004.  (R. 252). On September 23, 2004, Dr. Charles Kenney reviewed Dr. LaFata's assessment. Taking into account the evidence on which Dr. LaFata relied, Dr. Kenney affirmed the assessment.  (R. 244).

### Hearing Testimony

On January 18, 2007, Plaintiff appeared before an ALJ and gave testimony related to her disability claim.  She was represented by an attorney.  Plaintiff, who was 45 years old at the time of the hearing, testified that she had completed high school and one year of college.  (R. 344-45).  She testified that, in addition to her ankle and spinal injuries, she has urinary incontinence problems and headaches.

---

[1] Dr. LaFata noted in his evaluation report that his conclusions took into account the following information: "Clmnt is a 42 yr old female with complaints of a broken right ankle.  Clmnt had fractured the right ankle in August of 2003.  In Oct of 2003 clmnt was weight bearing as tolerated.  On Dec of 2003 clmnt was ambulating with a cane, but there was some tenderness over the medial malleolus.  In Jan of 2004, Clmnt received a 2nd operation on the right ankle.  On Feb. 2 of 2004, clmnt was placed in another plaster splint do to the reason that the splint was wet and cracked.  She was placed in a non weight bearing short leg cast.  03/05/04 clmnt is six weeks status post medial malleolus bone grafting.  X rays show that it is a slow healing fracture.  Clmnt is able at this time to start weightbearing as tolerated. Clmnt would be able to return to medium work 12 months from Jan. of 04."  (R. 252).

1:07-cv-01344-JBM   # 21   Page 8 of 20


(R. 351, 358-60). Plaintiff testified that she can only walk short distances, is limited in the housework that she can do, and that she has pain when she bends, reaches, and sits. (R. 352-59). She indicated that she takes about eight or ten Tylenol per day and that she occasionally takes Vicodin for pain relief. (R. 347-48). Plaintiff also testified that she suffers from depression and takes Zoloft. (R. 347, 352).

Edward Pagella, a vocational expert, also testified at the hearing. He opined that someone with Plaintiff's impairments would be capable of sedentary work that involved simple, repetitive tasks. (R. 361-63). Specifically, Mr. Pagella stated that someone with Plaintiff's impairments, education, and past work experience would be qualified and capable of performing work as an information clerk (4,800 positions in the local area), an order clerk (2,600 positions), or a cashier (6,200 positions). (R. 362).

When examined by Plaintiff's attorney, Mr. Pagella indicated that his vocational analysis assumed that Plaintiff was able to bend and reach to at least some degree. (R. 363). Specifically, he assumed that she would be able to perform repetitive actions with her arms. (R. 368). Mr. Pagella testified that if Plaintiff were not able to bend and reach, there would be no jobs for which she would be qualified. (R. 363, 367-68). Also, Mr. Pagella indicated that if Plaintiff's impairments required her to be absent from work once or twice a week, no jobs would be available to her. (R. 363-64). Mr. Pagella further indicated that if Plaintiff's impairments required her to take a break for more than ten minutes per hour, she would not be qualified for any work. (R. 370).

## ALJ's Decision

On January 25, 2007, the ALJ issued a decision concluding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 18).  In his report, he concluded that, although Plaintiff's impairments were severe, "she does not have an impairment that meets or medically equals, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  (R. 20). The ALJ indicated that he "considered the requirements of the listing for musculoskeletal impairments including fractures and degenerative disc disease." He then noted that Plaintiff "does not currently have evidence of non-union of her right ankle.  She does not have significantly limited range of motion in the spine or the necessary complications that would meet the criteria of a listed impairment." (R. 20).

The ALJ stated that Plaintiff "alleges she is disabled primarily due to pain." (R. 21).  He then stated that "[a]lthough the claimant alleges disabling, constant pain, she does not take pain medications consistently."  (R. 22).  In concluding that Plaintiff's pain was not disabling, the ALJ stated that he "took into account the medical evidence which indicates that the claimant was released to light/sedentary work, her daily activities, [and] her intermittent use of strong pain medications." (R. 22).  The ALJ also indicated that the record did not support the proposition that Plaintiff's headaches, urinary incontinence, and depression were severe enough to have any significant impact on her ability to work.  (R. 21-22).

The ALJ then addressed Dr. Eilers' opinion that Plaintiff could not participate in competitive employment.  The ALJ pointed out that the doctor's

9

opinion was based not only on his physical evaluation of Plaintiff but also on his knowledge of her educational and employment history. The ALJ concluded that Dr. Eilers' opinion as to Plaintiff's employability should be given little weight because the doctor exceeded the bounds of his expertise by analyzing factors unrelated to Plaintiff's medical condition. (R. 22).

Based on all the medical evidence and testimony, the ALJ concluded that Plaintiff was capable of lifting or carrying up to ten pounds frequently and as much as twenty pounds occasionally. (R. 22). The ALJ concluded that Plaintiff could stand and walk two hours in an 8-hour day. He found that she could occasionally climb ramps and can occasionally stoop and crouch. (R. 22). The ALJ further stated, "In giving [Plaintiff] every benefit of the doubt regarding difficulties in concentration due to pain, and depression, she is limited to simple, repetitive tasks." (R. 22). Taking into account the testimony of Mr. Pagella, the vocational expert who testified at the January 18, 2007 hearing, the ALJ concluded that Plaintiff could acquire a job that involved sedentary work. The ALJ found that there were a significant number of jobs in the national economy for which Plaintiff was qualified, given her physical capabilities, age, education, and employment history. (R. 23).

## DISCUSSION

### Legal Standards

To be entitled to disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To determine if the claimant is unable to engage in any

substantial gainful activity, the Commissioner of Social Security engages in a factual determination.  See  McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980).  That factual determination is made by using a five-step sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; see Maggard v. Apfel, 167 F.3d 376, 379-80 (7th Cir. 1999).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step.  Under the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant has an impairment that significantly limits her physical or mental ability to do basic work activities, the Commissioner will proceed to the next step.  Under the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements on the list are met or equaled, he declares the claimant eligible for benefits.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps.

In the fourth step, the claimant's Residual Functional Capacity is evaluated to determine whether the claimant can pursue her past work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If she cannot, then the Commissioner evaluates the claimant's ability to perform other work available in the economy.  20 C.F.R. §§ 404.1520(g), 416.920(g).

The plaintiff has the burdens of production and persuasion on steps one

through four.  However, once the plaintiff shows an inability to perform her past

work, the burden shifts to the Commissioner to show an ability to engage in some

other type of substantial gainful employment.  See Tom v. Heckler, 779 F.2d 1250,

1253 (7th Cir. 1985); see also Halvorsen v. Heckler, 743 F.2d 1221, 1225 (7th Cir.

1984).

Once a case reaches a federal district court, the court's review is governed by

42 U.S.C. 405(g) which provides that "[t]he findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive."

Substantial evidence is "such evidence as a reasonable mind might accept as

adequate to support a conclusion."  Maggard, 167 F.3d at 379 (quoting Richardson

v. Perales, 402 U.S. 389, 401 (1971)).

A court's function on review is not to try the case de novo or to supplant the

ALJ's finding with the Court's own assessment of the evidence.  See Pugh v. Bowen,

870 F.2d 1271, 1274 (7th Cir. 1989).  A court must only determine whether the

ALJ's findings were supported by substantial evidence and whether the proper legal

standards were applied.  See Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).

Furthermore, in determining whether the ALJ's findings are supported by

substantial evidence, credibility determinations made by the ALJ will not be

disturbed unless the finding is clearly erroneous.  See Imani v. Heckler, 797 F.2d

508, 510 (7th Cir. 1986), cert. denied, 479 U.S. 988 (1986).

However, the ALJ must articulate reasons for rejecting or accepting entire

lines of evidence.  Godbey v. Apfel, 238 F.3d 803, 807-08 (7th Cir. 2000).  The ALJ is

12

required to "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) (quoting Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985)).

**Analysis**

Plaintiff makes the following arguments: (1) the ALJ erred by not clarifying his reasoning in finding, under the third step of his analysis, that Plaintiff's impairments did not meet the requirements for listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (2) the ALJ erred by construing Plaintiff's thoracic compression fracture as "stable" in determining her Residual Functional Capacity; (3) the ALJ erred in finding that Plaintiff's Residual Functional Capacity allowed her to perform sedentary work; and (4) the ALJ erred in discrediting Plaintiff's complaints of pain.

1. ALJ's Application of Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1 to Plaintiff's Impairments

Plaintiff argues that "[t]he ALJ's decision is unclear on which 'listings' he was analyzing and [he] failed to properly apply relevant facts when determining whether the claimant meets or equals a listing." (Ptf.'s Br. at p. 6). Specifically, Plaintiff argues that the ALJ should have indicated what specific listing numbers he was referring to when he stated that he "considered the requirements of the listing[s] for musculoskeletal impairments including fractures and degenerative disease." (R. 20). Plaintiff suggests that, had the ALJ properly applied the evidence to applicable listings, he would have found that Plaintiff's impairments met the

13

elements in Listing Sections 1.02, 1.03, and 1.08.  In connection with that

argument, Plaintiff also contends that the ALJ did not address the January 14,

2005 results of an MRI of her ankle.  Plaintiff argues that the MRI results revealed

an injury that satisfied Listing Sections 1.03 and 1.08.[2]

In opposition, Defendant argues that the ALJ was not required to specifically

refer, by number, to each listing section he considered.  According to Defendant, the

ALJ's decision reflects that he considered all listings relevant to Plaintiff's fractures

and degenerative disc disease and that he found no applicable listings.  Defendant

further contends that nothing in the evidence supports Plaintiff's argument that her

impairments qualified as listed impairments under Listing Sections 1.02, 1.03, and

1.08. (Def.'s Br. at p. 10).

The Court agrees with Defendant that the ALJ adequately articulated his

assessment of the evidence in concluding that Plaintiff's impairments did not meet

the criteria for listed impairments.  See Scott v. Barnhart, 297 F.3d 589, 594 (7th

Cir. 2002).  The ALJ was not required to specifically refer to the numbers of the

listings that he considered.  See Rice v. Barnhart, 384 F.3d 363, 369-70 (7th Cir.

2004).  Further, it is reasonably clear from the context of his Step 3 analysis that

the ALJ considered whether and how Plaintiff's ankle fracture, vertebrae fracture,

and degenerative disc disease related to the various musculoskeletal impairments

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ indicated clearly

---

[2] Plaintiff does not adequately advance the theory that her impairments are equivalent in severity to the listed impairments.  Her arguments are confined to the notion that her impairments met the precise requirements of the listed impairments.

14

enough that the absence of non-union in Plaintiff's right ankle and the absence of

medically-diagnosed limited range of motion in her spine disqualified her from any

musculoskeletal impairment listings that might otherwise have been applicable.

(R. 20).  The musculoskeletal listing that requires non-union of a lower-extremity

bone fracture is easy enough to identify.[3]  The same is true for the musculoskeletal

listing that requires a loss of motion in the spine.[4]

   Plaintiff suggests that her impairments qualified her as disabled under

Listing Sections 1.02, 1.03, and 1.08 and that the ALJ erred in not mentioning these

sections.  The Court finds that any failure of the ALJ to consider these specific

listing sections was harmless error because nothing in the record would support the

conclusion that Plaintiff's impairments invoked these listings.  See Keys v.

Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error doctrine to

Social Security disability decision).  Listing Section 1.02 requires a dysfunctional

joint that creates an inability to ambulate effectively or an inability to perform

movement with the upper extremities.  See 20 C.F.R. Part 404, Subpart P,

Appendix 1 § 1.02.  There is no medical evidence in the record supporting the

---

[3] As Defendant points out, evidence of non-union in Plaintiff's right ankle is
relevant to Listing Section 1.06, which requires non-union of a fracture in the
weight-bearing bones of the lower extremities.  See 20 C.F.R. Part 404, Subpart P,
Appendix 1 § 1.06.

[4]  Listing Section 1.04 relates to disorders of the spine which cause limitation in
spinal motion and motor loss accompanied by sensory or reflex loss.  See 20 C.F.R.
Part 404, Subpart P, Appendix 1 § 1.04.

contention that Plaintiff is unable to ambulate effectively[5] or that her upper

extremities are limited in range of motion.  Similarly, Listing Section 1.03 requires

an inability to ambulate effectively, and nothing in the record supports the

conclusion that Plaintiff is unable to ambulate.

Plaintiff makes much of Dr. D'Souza's January 14, 2005 review of an MRI

performed on her ankle, which revealed an "osteochondral defect over the medial

side of the tibial plafond."  (R. 263).  She argues that the ALJ ignored this piece of

evidence and that, had he considered it, he would have found her to be disabled

under Listing Section 1.08.  Listing Section 1.08 describes the following injury: "Soft

tissue injury (e.g., burns) of an upper or lower extremity . . . under continuing

surgical management . . . directed toward the salvage or restoration of major

function, and such major function was not restored or expected to be restored within

12 months of onset."  See 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.08.

Plaintiff fails to explain how the osteochondral defect that Dr. D'Souza discovered

qualifies her as disabled under this listing section.  Her attempt to characterize the

defect as a "soft tissue injury" under the listing section is unpersuasive.  Further,

she does not attempt to address, among other key points, why the Court should

consider the defect as being under "continuing surgical management."  The Court

---

[5] An "inability to ambulate effectively" is defined as "having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device that limits the functioning of both upper extremities." See 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00B2b.  There is no evidence in the record that Plaintiff uses a walking device that requires her to use both hands. To the contrary, the ALJ found that Plaintiff walks with a cane and that she can go without using the cane when she is at home.  (R. 20).  There is substantial evidence in the record to support this finding.  (R. 255, 263).

concludes that there is no evidence on record to support a finding that Plaintiff is disabled under Listing Section 1.08.

2. <u>ALJ's Conclusion that Plaintiff's Thoracic Compression Fracture was "Stable" in Determining Her Residual Functional Capacity</u>

Plaintiff argues that the ALJ misconstrued the record by characterizing her thoracic compression fracture as "stable." In rebutting the ALJ's conclusion, Plaintiff points to various medical records spanning from 2004 to 2007[6] which, she argues, demonstrate the pain associated with her compression fracture. Plaintiff does not precisely indicate to the Court how this alleged error of the ALJ altered the outcome of his decision. Nevertheless, there is substantial evidence to support the ALJ's finding. Dr. Eilers used the term "stable" to describe Plaintiff's thoracic compression fracture on October 18, 2004. (R. 255).

3. <u>ALJ's Finding that Plaintiff's Residual Functional Capacity Allowed Her to Perform Sedentary Work</u>

Plaintiff disputes the ALJ's finding that she is physically capable of performing sedentary work. The ALJ indicated in his decision that this finding was based on medical evidence indicating that Plaintiff's own doctors released her to light sedentary work. (R. 22). On September 17, 2004, Dr. Sompalli indicated on a form that Plaintiff was cleared to return to light work duties as of that date, specifically remarking "Desk duty only." (R. 242). Further, on July 28, 2005. Dr.

---

[6] Defendant notes that there is evidence in the record which Plaintiff submitted to the Appeals Council after the ALJ's January 2007 decision. The evidence relates to Plaintiff's medical condition after the ALJ's decision was issued. Although this evidence is technically part of the administrative record, it is not relevant to the correctness of the ALJ's decision. <u>Diaz v. Chater</u>, 55 F.3d 300, 305 n.1 (7th Cir. 1995). Plaintiff offers no argument as to why the Court should consider this additional evidence, and so the Court will not consider it.

Eilers indicated in medical records that Plaintiff "will need to stay in light sedentary work parameters." (R. 260). The ALJ's finding is supported by substantial evidence. The ALJ was correct in according very little weight to Dr. Eilers' opinion that Plaintiff is a good candidate for Social Security disability insurance. See White v. Barnhart, 415 F.3d 654, 660 (7th Cir. 2005) (physician's opinion as to area outside his expertise is not credited). As Dr. Eilers himself noted, his opinion took into account non-medical factors such as Plaintiff's education and her employment history. (R. 260).

4. ALJ's Credibility Determination regarding Plaintiff's Complaints of Disabling Pain

The ALJ's credibility determination regarding the severity of Plaintiff's pain relates most directly to Plaintiff's ability to perform sedentary work. The ALJ found, at Step 5 of the analysis, that Plaintiff's functional capacity would allow her to perform gainful work in the economy. This finding was based heavily on the testimony of the vocational expert, Edward Pagella. (R. 23). Mr. Pagella testified that, given Plaintiff's vocational profile and her other physical capabilities, if she were able to sit, bend, and reach to some degree, she would be qualified to work as an information clerk, order clerk, or cashier. (R. 362, 367). Mr. Pagella indicated that there were a significant number of these jobs available in the national economy and, more specifically, in the Chicago metropolitan area and surrounding counties. (R. 362).

However, Mr. Pagella also testified that if Plaintiff were unable to bend and reach to some degree, no work would be available to her. (R. 363). In addition, it

seems apparent from Mr. Pagella's testimony that if Plaintiff were not able to sit for average periods of time or work regularly and somewhat efficiently, she would not be capable of employment. (R. 364-65, 367-38). Accordingly, the ALJ's finding at Step 5 that Plaintiff is gainfully employable in the national economy was based on a finding that Plaintiff does not experience pain of the kind that makes it impossible for her to sit, bend, reach, or work regularly and efficiently. (R. 21-22).

Plaintiff does not directly dispute the ALJ's finding that she is physically capable of sitting, bending, and reaching. Plaintiff does claim, however, that there is insufficient evidence to support the ALJ's discrediting of her complaints that the pain she experiences, in conjunction with any movement except for lying back, is so severe that it is disabling. This Court must give heavy deference to the credibility determinations of the ALJ and must preserve them unless they are "patently wrong." Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

The ALJ concluded that the cumulative pain Plaintiff experiences is not disabling. (R. 22). He based that conclusion on findings that Plaintiff was released by her physicians to perform sedentary work, that she participates in regular daily activities, and that she uses prescription pain medication only intermittently. (R. 21). Each of these findings is supported by substantial evidence in the record. (R. 242, 347, 353-54). These findings also reasonably bear on the credibility of Plaintiff's assertions about the disabling effects of her pain.

With respect to Dr. Eilers, the ALJ correctly pointed out that the doctor's remarks about the severity of Plaintiff's pain and its effect upon her employability seem to be based solely on Plaintiff's own complaints. (R. 22). Apart from these

unreliable remarks, made by Dr. Eilers in certain medical records, there appears to be no other evidence in the record corroborating Plaintiff's assertion that her pain is so severe that it is disabling.  Even if there were some evidence to this effect, the Court still could not say that the ALJ's credibility determination regarding the severity of Plaintiff's pain is patently wrong.  Therefore, the Court will not disturb the determination.  The Court finds that substantial evidence supports the ALJ's conclusion that the Commissioner met his burden at Step 5 of the analysis.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Affirmance is GRANTED.

ENTERED this <u>22nd</u> day of January, 2009.

s/ Joe B. McDade
JOE BILLY McDADE
United States District Judge
